**UNITED STATES of America ex rel.
Calvin Leroy MADISON,
Petitioner,**

v.

**Joseph CANNON, Warden Illinois State
Penitentiary, Stateville Branch,
Respondent.**

**No. 74 C 2625.**

United States District Court,
N. D. Illinois, E. D.

Jan. 27, 1975.

Kenneth L. Jones, Chicago, Ill., for petitioner.

William J. Scott, Atty. Gen., Melbourne A. Noel, Jr., Raymond McKoski, Asst. Attys. Gen., Chicago, Ill., for respondent.

## MEMORANDUM ORDER

MARSHALL, District Judge.

Before me is the motion of respondent Joseph Cannon to dismiss the habeas corpus petition of Calvin Leroy Madison [hereafter "Madison"] filed pursuant to 28 U.S.C. § 2241 *et seq.* Since matters outside the pleadings have been submitted to me for my consideration, the motion is treated as one for summary judgment. Rules 12(b)(6) and 56 of the Federal Rules of Civil Procedure.

In 1970 Madison was convicted of armed robbery and murder in an Illinois court and sentenced to death. After consolidation of Madison's direct appeal and appeal from the denial of his post-conviction petition, the Illinois Supreme Court affirmed Madison's conviction but

---

3. *Tracy v. Newsday, Inc.,* 5 N.Y.2d 134, 137, 182 N.Y.S.2d 1, 4, 155 N.E.2d 853, 855 (1959).

vacated the sentence imposed thereon in light of *Moore v. Illinois*, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972). The cause was remanded with directions to sentence Madison to a penalty other than death.[1] Thereafter, Madison filed the habeas corpus petition now pending before me, alleging that the oral admissions used at his trial were obtained in violation of his privilege against self-incrimination. More precisely, Madison alleges that his oral admissions were obtained without an intelligent and understanding waiver of the procedural safeguards enunciated in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed.2d 694 (1966).[2]

Madison does not seek to adduce additional evidence. Consequently, for the purposes of the motion, I have considered the testimony elicited at the motion to suppress and trial in state court.

At approximately midnight of January 22, 1970, Madison was arrested by police officers Sebastian Aiello and David Harmon. Thereafter he was handcuffed and placed in a squad car. While proceeding to the police station, Harmon read Madison the Miranda safeguards and asked him whether he understood them. Madison responded affirmatively to the question. No further questioning occurred in the squad car.

Upon arriving at the police station, Madison was given a primer residue test[3] and his shoes were taken from him for the purpose of analysis.[4] Thereafter, he was placed in the city jail. Up to this time, Madison was not questioned.

At 4:45 a. m. on the morning of January 23, 1970, police officers William Francis [hereafter "Francis"] and Kenneth Ludwig [hereafter "Ludwig"] went to Madison's cell, awakened him and took him to the detective bureau. There Francis read Madison the Miranda safeguards and asked him whether he understood them, to which Madison responded affirmatively. Thereafter Francis asked Madison whether he wanted "to talk." At this point Madison asked Francis what he wanted to talk about. Francis then read to Madison the complaint charging him with armed robbery and attempted murder.[5] In response Madison admitted his participation in the crimes.[6] He, however, refused to say anything further until he talked to his father.

1. On remand, Madison was sentenced to a term of imprisonment of not less than 75 years and not more than 150 years.

2. In *Miranda* the Supreme Court established certain procedural safeguards to secure the privilege against self-incrimination. The Court stated:

Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly, and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. . . . The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned. 384 U.S. at 444–45, 86 S.Ct. at 1612.

Though these particular safeguards are not rights protected by the Constitution, *Miranda*, 384 U.S. at 467, 86 S.Ct. 1602; *Michigan v. Tucker*, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974), they must be observed unless other procedures, which are as effective in apprising the accused of his right of silence and in assuring a continuous opportunity to exercise it, are followed. *Miranda*, 384 U.S. at 467, 86 S.Ct. 1602.

3. The purpose of the test was to determine whether Madison had recently discharged a firearm.

4. Madison's shoes were taken for the purpose of comparing them with footprints discovered at the scene of the armed robbery and murder.

5. At this time, the victim of the armed robbery and shooting had not died.

6. Madison does not contest the admissibility of these statements.

At 6:30 a. m. Madison telephoned his father. At the conclusion of the telephone call, Madison agreed to talk to Francis and Ludwig about the armed robbery and shooting, but, on the advice of his father, Madison refused to sign any statement without consulting a public defender.

Francis then gave Madison a waiver of rights form detailing the Miranda safeguards, which Madison read.[7] Thereafter, Francis read the entire form to Madison, who subsequently signed it. Francis then placed a statement form in a typewriter. Madison spoke, Francis typed and then read what he typed to Madison. The process took about 20 minutes to complete. In the statement Madison admitted the armed robbery and shooting. When the statement was completed, Madison read the statement, said what appeared thereon was true but refused to sign it. At trial Madison's oral admissions were introduced in evidence.

At the time of the interrogation, Madison was 21 years old, had completed the 11th grade and could read and write.

Madison contends that his refusal to sign any statement without consulting a lawyer, followed by an apparent willingness to allow further questioning, alerted his interrogators that he was assuming contradictory positions, thus requiring them to inquire further of him whether his inconsistence was the product of intelligence and understanding or of ignorance and confusion. Moreover, Madison argues that his refusal to sign

any statement, followed by his willingness to make oral statements, made it incumbent on Francis and Ludwig to make clear to him that both written and oral statements could be used against him at trial. Failure to so inquire, rendered his oral statements constitutionally inadmissible.

In *United States v. Nielsen*, 392 F.2d 849 (7th Cir. 1968), the defendant, after being warned of his right to remain silent and to have an attorney present at his questioning, said he would not sign a waiver of rights form or "anything," until he talked to his attorney. He refused, however, to call his attorney and stated that the questioning could continue. Thereupon, the interrogation was resumed. The Court of Appeals for the Seventh Circuit held that the defendant's responses to subsequent questioning were inadmissible, stating:

. . . the defendant's refusal to sign the waiver form, followed by an apparent willingness to allow further questioning, should have alerted the agents that he was assuming seemingly contradictory positions with respect to his submission to interrogation. Instead of accepting the defendant's equivocal invitation, the agents should have inquired further of him before continuing the questioning to determine whether his apparent change of position was the product of intelligence and understanding or of ignorance and confusion. However, no further inquiry took place. In the absence of such an inquiry, we are com-

---

7. The form read:

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

Waiver of Rights

I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

pelled to conclude that the defendant's negative responses to the questions asked him were not made after a knowing and intelligent waiver of his rights. Consequently, the trial court erred in admitting the testimony of the subsequent interrogation. 392 F. 2d at 853.

Thus, instead of accepting the defendant's invitation to continue the questioning, the interrogator should have inquired further whether his apparent change in position constituted an intelligent and understanding waiver of his privilege against self-incrimination.

Here Francis, after Madison refused to sign any statement without consulting a public defender, gave Madison a waiver of rights form to read. After Madison read it, Francis read the entire form to Madison, who thereafter signed it. Consequently, the evidence shows that Francis, upon being confronted with Madison's seemingly contradictory position on his willingness to submit to interrogation, made further inquiry into Madison's knowledge and understanding of the Miranda safeguards. Madison testified at the motion to suppress that the Miranda safeguards were read to him 4 or 5 times the evening of his interrogation and that each time they were read to him, he understood them. Record, vol. 1 at 252.

I conclude that Madison's statements, made after he signed the waiver of rights form, were given after an intelligent and understanding waiver of his privilege against self-incrimination. Necessarily, I reject the contention that Francis and Ludwig were required to tell Madison that both written and oral statements could be used against him at trial. While cases may be conceived where it is incumbent on the interrogators to so inquire,[8] I do not find that such a procedure was required in the present factual setting.

Accordingly, the motion of respondent Joseph Cannon for summary judgment be and is hereby Granted. A certificate of probable cause is issued pursuant to 28 U.S.C. § 2253. Petitioner is granted leave to proceed *in forma pauperis* on appeal. 28 U.S.C. § 1915(a).

---

8. For example, the facts in *Nielsen*, where the apparent change in the accused's position on his willingness to submit to interrogation occurred after his refusal to sign a

waiver of rights form, might demand that the interrogator explain the admissibility of written and oral statements.